UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Tanisha Rogers,<br>*Plaintiff*,<br><br>v.<br><br>Edward Apicella, Timothy Jackson, Lee Levesque,<br>and City of Waterbury,<br>*Defendants*. | Civil No. 3:07cv1199 (JBA)<br><br><br><br>March 26, 2009 |

**RULING ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
[Doc. # 31], DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Doc. # 33],
AND PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT [Doc. # 46]**

Plaintiff Tanisha Rogers brought suit against the City of Waterbury (the "City"), Detective Edward Apicella, Detective Timothy Jackson, and Lieutenant Lee Levesque (collectively, "Defendants") following her acquittal on a criminal charge of possession with intent to sell a half-gram or more of narcotics. She brings claims of conspiracy to violate her civil rights under 42 U.S.C. § 1983; of unlawful warrantless entry, unlawful warrantless seizure, false arrest, and malicious prosecution under the Fourth Amendment and under the Connecticut Constitution, Article First, Sections 7 and 9; and of trespass, intentional infliction of emotional distress, and municipal liability under state law.[1] Following discovery, Plaintiff moved for summary judgment on her claims for warrantless entry, warrantless seizure, false arrest, and malicious prosecution under both the federal and state constitutions, and for trespass, and Defendants moved for summary judgment on all claims. After Defendants submitted the affidavit of then-Detective Gary Angon in connection with their motion for summary judgment—an affidavit in which Angon averred Sergeant Scott

---

[1] At oral argument Plaintiff acknowledged that her municipal-liability claim is for indemnity only if she prevails.

Stevenson was the commanding officer under whose direction he entered Plaintiff's home without a warrant—Plaintiff moved for leave to amend her complaint to name Angon and Stevenson as defendants.

I.      **Factual Background**

   A.      *Investigation of Murder of Robert Pagan*

The record reveals the following.  Late on October 4, 2004, Robert Pagan was shot and killed inside the Northside Café in Waterbury.  Officers of the Waterbury Police Department ("WPD") responding to the call interviewed several eyewitnesses who provided them with descriptions of the shooting and shooter as well as the maroon sedan the shooter drove to and away from the Northside Café.  One witnesses, Taliferro Brown, though not an eyewitness to the shooting, stated that a few minutes before the shooting Pagan told him by cell phone while he (Brown) was en route to the Northside Café that he (Pagan) was afraid for his life because he had seen Charles Tucker, also known as Chaz, in the bar.  When Brown learned of Pagan's murder upon arriving at the bar, he immediately suspected that Tucker had killed Pagan, and identified Tucker in a photo array.  Multiple eyewitnesses to the shooting who did not previously know Tucker also identified Tucker as the shooter from photo arrays.  Brown also stated that he and Pagan were members of the Mill Ridge Boys gang, and that they had been involved over the course of the previous months in a series of violent encounters with Tucker, who was a member of the Beaver Street Boys gang.

According to the October 6th search warrant affidavit, Brown also told WPD officers that Tucker had a girlfriend named Tanisha Rogers—the Plaintiff—who worked at the Danbury office of the Connecticut Department of Children and Families ("DCF").[2]

In connection with WPD officers' arrest on October 5th of Demietre Taft and Jamar Crawford after finding guns and drugs in their car, Apicella found in Taft's pocket a paper listing an address (100 Mark Lane, Apartment M-2) and a phone number which he later linked by reverse-lookup to 100 Mark Lane, Apartment K-3 ("Unit K-3"). The affidavit also states that Connecticut Motor Vehicle records indicate Tucker's address to be Unit K-3.[3]

On the afternoon of October 5th, Apicella went to the Danbury DCF office to speak with Rogers "[o]ut of concern that Taft and Crawford were going to [Unit K-3] to shoot Tucker." According to Apicella, Rogers told him that she and Tucker lived together in Unit K-3, that Tucker "drives a burgundy Infinit[i]" and drove it that morning, and that "[Tucker] repeatedly called her today while she was at work," but she refused to provide Apicella with Tucker's cell phone number and she called Tucker despite Apicella's advice not to do so. According to Rogers, before Apicella arrived at her desk with two other detectives and told her Tucker was a suspect in Pagan's murder, she did not know about the shooting.

---

[2] Witness Statements of David Brame, Ricardo Ashley, O'Jaye D. Allen, Terrence Saunders, Steven Womber, Taliferro Brown, Cyrelle Conyers, Curtis Conyers, Kevin Osbia, Tony Richardson, and Yvette Rodriguez, Exs. L–P & T & W–Z & JJ to Defs.' Mem. Supp. Mot. Summ. J. [Doc. # 33] ("Defs.' Mem. Supp."); Affidavit of Timothy Jackson & Steve Pedbereznak in Support of Warrant for Search and Seizure at K-3 ("Search & Seizure Warrant"), Ex. AA to Defs.' Mem. Supp., at ¶¶ 4 & 7.

[3] Apicella Supplementary Report dated 10/5/04, Ex. R to Defs.' Mem. Supp. ("Apicella Suppl. Report"), at 2 (noting that Taft stated that the address and phone number were of "someone I gotta call later"); Property Record Report, Ex. V to Defs.' Mem. Supp. (noting "one piece of paper w/ phone number + address" found in Taft's pocket).

She wanted to speak outside the building, but Apicella continued to speak with her at her desk.  Eventually they moved outside the building, and Rogers told Apicella that she did not know Tucker's whereabouts and that she had argued with Tucker that morning.  "[Apicella] finally allowed [her] to leave" after 30–45 minutes.[4]

According to Apicella, the Danbury police then patched through to him an anonymous caller who identified herself as a coworker of Rogers and who stated that Tucker called Rogers at work on October 5th multiple times, and that Rogers ordered Tucker to "[g]et the fucking gun out of my house."  Plaintiff disputes Apicella's description of this call's content, pointing to Charles Tucker's averments that he never "ha[d] a conversation with Tanisha Rogers regarding the inoperable handgun or the drugs," and "[Rogers] never told me to remove a gun from the condominium."[5]

---

[4] Apicella Suppl. Report at 2; Deposition of Tanisha Rogers ("Rogers Dep."), Ex. 1 to Pl.'s Obj. Defs.' Mot. Summ. J. [Doc. # 36] ("Pl.'s Obj."), at 83:22–96:5.

[5] Apicella Suppl. Report at 2; Letter from Defense Counsel to Plaintiff's Counsel, Ex. 3 to Pl.'s Obj. (enclosing recording of portion of call ending at patch-through); Affidavit of Charles Tucker, Ex. 2 to Pl.'s Obj., at ¶ 7.

B.      *Afternoon/Evening of October 5th at Unit K-3*[6]

At Plaintiff's criminal trial,[7] Apicella testified that he did not "communicate with anyone, including Lieutenant Levesque, who was waiting at [Unit K-3] after [he] spoke with Tanisha Rogers on [October 5th]," but also testified that he "sen[t] Lieutenant Levesque to secure [Unit K-3]" at "some time after 6:00" after speaking with Rogers at approximately 5:00 p.m.  Apicella further testified that he and Stevenson were the co-lead investigators of Pagan's murder, and that he assigned various officers to a detail at Unit K-3 under Levesque's command, but did not communicate with Levesque after assigning him to secure Unit K-3 and did not order any WPD officer to conduct a search of Unit K-3 on that date. Levesque testified both that "[t]o the best of [his] recollection it was Sergeant Apicella" who was the investigating officer "actively involved with the investigation" "at the location" of Unit K-3 on October 5th, and that he did not recall seeing Apicella at Unit K-3 on October 5th.[8]  Jackson testified that the WPD chain of command in the Pagan murder investigation

---

[6] Unit K-3 is a three-level condominium.  The garage is located on the ground floor of the single structure, and a door leads from the garage into a small laundry room.  Stairs to the second floor are at the end of a hallway on the ground floor, on the other end of which is the condominium's front door.  A living room and kitchen are located on the second floor, and bedrooms are on the third floor.  (Apicella Prob. Cause Test. at 6:22–26 & 7:11–20; Deposition of Tia Rogers, Ex. H to Pl.'s Mem. Supp., at 34:6–17.)

[7] Plaintiff's criminal trial in Connecticut Superior Court (Judicial District of Waterbury) on the charge of possession of crack cocaine with the intent to sell it terminated in her favor when her motion for acquittal was granted on the ground that the prosecution had not proffered evidence sufficient to establish that she had exercised dominion and control over the drugs found in her home on October 6th.  (Transcript of Criminal Trial ("Crim. Trial Tr."), June 15, 2005, Ex. O to Pl.'s Mem. Supp., at Afternoon Session at 26:10–17 & 30:15–16.)

[8] Crim. Trial Tr., Ex. D to Defs.' Mem. Supp., at Morning Session at 67:4–13 & 68:18–21; *id.* at Afternoon Session at 21:2–14; Crim. Trial Tr., Ex. A to Pl.'s Mem. Supp., at

began with Captain Mark Deal, under whom worked Stevenson, under whom worked Apicella, who was a supervisor in the investigation; that Deal and Stevenson "were the two main people running most of the show back then;" and that Levesque did not direct Jackson at all in the investigation into Pagan's murder.[9]

Levesque testified that he did not remember why he was at Unit K-3 or if Apicella sent him there, or what instructions he was given when dispatched to Unit K-3. He also testified he "answer[ed] in the chain of command to Sergeant Apicella." He did not write a report on his detail at Unit K-3 on October 5th. He insisted that he was not in charge of any detail at Unit K-3 on October 5th, and that either Apicella or Stevenson would have been in charge at Unit K-3, even if neither were physically there. He also insisted that the other officers at Unit K-3 on October 5th "were not acting under [his] direction," but instead acted under Apicella's direction.[10]

Rogers testified that she arrived at Unit K-3 at 7:00 p.m. According to Levesque, after Rogers opened the garage door remotely and pulled into the garage at Unit K-3, he drove into the garage after her to prevent her from closing the garage door, instructed her to get out of the vehicle, and explained that he was there "[t]o secure the residence" while

---

Morning Session at 66:21–67:3; Apicella's Responses to Plaintiff's Interrogatory Nos. 5 & 15, Ex. E to Defs.' Mem. Supp.; Deposition of Lee Levesque ("Levesque Dep."), Ex. B to Pl.'s Mem. Supp. Mot. Part. Summ. J. [Doc. # 31] ("Pl.'s Mem. Supp."), at 17:9–14 & 18:23–25.

[9] Affidavit of Timothy Jackson, Ex. B to Defs.' Mem. Supp., at ¶¶ 6–17; Tucker Arrest Warrant for Pagan's Murder, Ex. U to Defs.' Mem. Supp., and Search & Seizure Warrant for Unit K-3, Ex. AA to Defs.' Mem. Supp.; Search & Seizure Warrant at 1 & ¶ 6; Warrant for Arrest of Rogers, Ex. DD to Defs.' Mem. Supp.; Jackson Dep. at 25:12–20.

[10] Levesque Dep., Ex. I to Defs.' Mem. Supp., at 18:18–22 & 20:2–22:10; Levesque Dep., Ex. 15 to Pl.'s Obj., at 19:22–20:1.

"looking for . . . a fellow named Charles, who we believed lived there."  Rogers said that Tucker was not inside Unit K-3, and Levesque himself observed no "signs of someone being in [Unit K-3] at that time," such as "a shadow or a face or a television flickering or anything like that."  Levesque several times "told her that she couldn't go back in" to Unit K-3 because "we were looking for a murder suspect" and he needed "[t]o protect the crime scene and to search for a suspect," even though Apicella had not instructed him to prevent Rogers's entry into Unit K-3 and even though Levesque was not attempting to get a search warrant and did not know whether other WPD officers were attempting to get a search warrant.  (Apicella later testified that he knew Levesque kept Rogers out of Unit K-3.)  According to Rogers, an officer had opened a door between the garage and the living quarters of Unit K-3, triggering an alarm, which she turned off, but all the officers denied opening the door.  When she sought entry into her home to "get some clothes," she was refused entry and an officer questioned her about Tucker's whereabouts and "threaten[ed] me[,] saying he was going to call the commissioner and get me fired from my job if I didn't cooperate with them," and stated that "'you're going to get fired and we're going to take your kids away from you'" if she did not tell WPD officers where Tucker was located.  She also testified that unknown officers told her that they were getting a search warrant.[11]

---

[11] Levesque Dep., Ex. I to Defs.' Mem. Supp., at 25:3–27:25 & 29:6–33:2 & 50:1–51:5; Rogers Dep. at 109:18–110:12; Crim. Trial Tr., Ex. 10 to Pl.'s Obj., at Morning Session at 70:5–9 (testimony of Apicella); Levesque Dep., Ex. 15 to Pl.'s Obj., at 33:18–34:2; *see also* Affidavit of Tanya Rogers, Ex. F to Pl.'s Mem. Supp., at ¶ 2; Rogers Dep., Ex. 1 to Pl.'s Obj., at 99:9–11 & 110:25–111:24 & 117:1–118:5.

Levesque testified that while he did not go into Unit K-3, some officers whose number and identities he did not know did enter the living quarters of Unit K-3 that evening, and that he did not attempt to prevent their entry.[12]

Although there is no specific evidence in the record that Angon was at Unit K-3 on October 5th other than his affidavit, Angon avers that he was a "lead investigator[]" of the Pagan murder investigation, along with Deal, Apicella, Stevenson, and Jackson, that only Stevenson directed Angon and other WPD officers to go to Unit K-3 on October 5th to "secure the premises until warrants could be issued," and that he communicated only with Stevenson with no direction from Apicella, Jackson or Levesque.  Angon avers that Rogers arrived at Unit K-3 fifteen minutes after he and other WPD officers had arrived, and that she drove directly into the garage, whereupon Angon, not Levesque, "asked if Charles Tucker was in the vehicle and [Rogers] replied that he was not," and that she did not know whether Tucker was in Unit K-3 or where he was.  After this colloquy, Angon noted that Rogers was upset to find WPD officers at her home and that she looked at the doorway and asked to go into her home, and then Angon "and another officer entered [Unit K-3] through a doorway

---

[12] (Levesque Dep., Ex. 15 to Pl.'s Obj., at 34:3–18; Levesque Dep., Ex. I to Defs.' Mem. Supp., at 35:4–38:24 & 45:1–47:7; *see also* Affidavit of Cecilia McCray, Ex. 7 to Pl.'s Obj., at ¶¶ 2–6 (noting that police escorted Plaintiff to her neighbor's house to use the neighbor's bathroom).)  Levesque offered little recollection about his activities at Unit K-3 that afternoon.  He did not remember whether Rogers wanted to go to her neighbor's house, whether a WPD officer accompanied Rogers to that house when she wanted to use the bathroom, whether Rogers asked for permission to enter Unit K-3 with a police escort to gather clothes for her infant daughter, whether he spoke with Deal, Stevenson or Apicella while at Unit K-3 on October 5th, how long he was at Unit K-3, where he went when he left Unit K-3, or whether he had a flashlight with him.  He also could not recall whether he was involved in other WPD officers' efforts to obtain a warrant to search Unit K-3 or to arrest Rogers.  (Levesque Dep., Ex. I to Defs.' Mem. Supp., at 35:4–38:24 & 45:1–47:7.)

8

that led from the garage to the living quarters and conducted a quick cursory visual inspection of the premises to confirm that Charles Tucker was not hiding inside the unit." He generalizes that "[t]here were strong reasons to believe that Charles Tucker was in the premises," but gives no reasons.  After this search, Angon avers, he remained at Unit K-3 until 11:30 p.m., during which time neither he nor any other WPD officer again entered Unit K-3.[13]

In contrast, Tia Rogers, one of Plaintiff's sisters, averred that she arrived at Unit K-3 at approximately 8:30 p.m. on October 5th and plainclothes officers told Plaintiff that "they were awaiting the arrival of a search warrant for the premises;" that she and Plaintiff both left Unit K-3 between 9:00 p.m. and 10:00 p.m., and that when she returned, the "laundry room door was open and . . . the light was on," and that she witnessed an officer go back into the laundry room through a door in the garage and turn off the light.  At approximately 11:00 p.m., several marked and unmarked police cars arrived at Unit K-3 and more than ten uniformed and plainclothes officers "ran into the house with their flashlights," after which Tia Rogers witnessed the light from the officers' flashlights throughout the three levels of Unit K-3.  She approached the apartment when she saw the officers enter, but left the area after an officer threatened to arrest her and "ordered [her] to go home."[14]

In response to questions about "who some of the officers were who took part in the search on [October] 6" and "any . . . officers [who] were also present on the evening of the

---

[13] Affidavit of Gary Angon ("Angon Aff."), Ex. C to Defs.' Mem. Supp., at ¶¶ 5–9 & 11–17 & 18.A & 19–20; Rogers Dep., Ex. F to Defs.' Mem. Supp., at 107:6–19.

[14] Affidavit of Tia Rogers, Ex. MM to Defs.' Mem. Supp. and Ex. G to Pl.'s Mem. Supp., at ¶¶ 2–6 & 8–11; Tia Rogers Dep. at 25:4–17 & 28:8–35:3.

fifth," Apicella testified at Rogers's criminal trial that "[Angon] was not there for the search" and that "[Angon] was not involved in the search," but also that "[Angon] had come after[]" Apicella had finished executing the search warrant on Unit K-3 on October 6th. It is undisputed that Jackson was not at Unit K-3 on October 5th.[15] The record contains no report by any WPD officer regarding any entry into Unit K-3 on October 5th.

C.      *October 6th Search of Unit K-3*

Jackson avers that on October 6th he submitted affidavits in support of warrants to search Unit K-3 and arrest Tucker for Pagan's murder, and obtained both around 9:50 a.m.[16] The search warrant permitted WPD officers to enter Unit K-3 to search for "[d]ark colored men's clothing including shirts, pants, jackets, coats[,] [b]lack doo-rags or skull caps[,] [p]istols and ammunition[, and] [k]eys, names, ad[d]resses telephone numbers of known gang members and proof of occupancy." He participated in the execution of the search warrant on Unit K-3 with Apicella and another officer named Patrick Moynihan, and maybe others. Apicella testified that he led WPD officers in executing the search warrant on Unit K-3 at 10:45 a.m. on October 6th and, varyingly, that Angon was and was not at the search. He "assigned [to himself] the basement, the garage, and the back room which I'll call the laundry room and that's the room that I searched," in which he found, on a bookshelf, "a lamp that had an open base" inside of which he found "crack-cocaine, 13 partial plastic bags

---

[15] Crim. Trial Tr.–Ex. D to Defs.' Mem. Supp., at Morning Session at 71:10–72:7; Jackson's Responses to Plaintiff's Interrogatory No. 5, Ex. G to Defs.' Mem. Supp.

[16] Jackson avers that when he prepared the search warrant he did not know who was at Unit K-3 on October 5th and whether anyone had entered Unit K-3 without a warrant. The last event to occur that Jackson included in the nine-paragraph search warrant affidavit was Apicella's conversation with the anonymous caller from DCF on the afternoon of October 5th. (Jackson Aff. at ¶¶ 13–14; Search & Seizure Warrant at ¶ 6.)

bagged up consistent for what crack-cocaine would be used for street sale as well as a silver-colored 25 automatic handgun." He testified he found a driver's license listing Tanisha Rogers's name in the laundry room, but when confronted with two photographs taken during the search by WPD Forensic Unit officers showing the license in two different places, Apicella conceded that the license "[c]ould . . . have been moved with a hand."[17]

Acknowledging that a report regarding WPD's execution of the search warrant on Unit K-3—written by Jackson and signed by Apicella—reflects that Apicella found the license, a crack pipe, and paperwork linking Rogers and Tucker to the apartment in the kitchen, Apicella said that the report was "wrong" and that he never told Jackson where he found the items. Jackson testified that Apicella told him, after Jackson filed his report, that he had inaccurately reported where Apicella had found the paperwork. Tucker, however, avers that he stored the gun, drugs and bags in the lamp, that he placed the lamp upright, with felt attached to the bottom, on the bookshelf in the laundry room, and that to his knowledge Rogers did not even know he had the drugs or gun, and that he last saw the paperwork on October 3rd in the kitchen.[18]

Lopes inventoried the items seized from Unit K-3 on October 6th, and wrote a report in July 2005 regarding her observations during the laundry room search. Her report

---

[17] Deposition of Lucinda Lopes ("Lopes Dep."), Ex. J to Pl.'s Mem. Supp., at 21:5–15 (noting that another officer took photographs) & 68:25–69:8 (describing Apicella as "the commanding officer"); Apicella Prob. Cause Test., Ex. 9 to Pl.'s Obj., at 5:21–6:12 & 8:3–16; Crim. Trial Tr., Ex. 10 to Pl.'s Obj., at Morning Session at 86:27–90:5 (testimony of Apicella); Deposition of Timothy Jackson ("Jackson Dep."), Ex. H to Defs.' Mem. Supp., at 13:2–25.

[18] Jackson's Supplementary Report, Ex. 11 to Pl.'s Obj.; Crim. Trial Tr. at Morning Session at 86:27–87:3 (testimony of Apicella; Jackson Dep. at 26:9–29:15; Tucker Aff. at ¶¶ 3–7.

includes discrepancies with Apicella as to whether the lamp was found upright or turned over with a gun with an obliterated serial number, crack cocaine, and plastic bags inside, but corroborates his testimony that he found the paperwork in the laundry room. Lopes's report also states that a paper bag bearing Charles Tucker's name and containing drug-selling paraphernalia was on the laundry room floor. Lopes testified that she personally observed the lamp being turned over, and that another officer took photographs of it before "empt[ying] the contents of the lamp to photograph what was inside because we wouldn't have been able to photograph it in its place." She explained that Apicella, Jackson and Levesque, among others, were in the laundry room when she arrived, and that when she wrote the report she "may have forgotten" the fact that the lamp was overturned and the felt was peeled back from its base when she first arrived. She then testified that the lamp and its contents required moving because with the lamp in its original place a photographer would be unable to maneuver into a position to photograph its contents.[19]

Based on the October 6th search, Jackson applied for and obtained warrants to arrest Tanisha Rogers and Charles Tucker for "possession with intent to sell ½ a gram or more [of] cocaine in freebase form . . . and altering or removing identification marks on a firearm." In support of the Rogers arrest warrant Jackson averred that Pagan had been murdered, that WPD officers executed a search warrant on Unit K-3, and that they found a gun with the serial number scratched off as well as a plastic bag containing cocaine inside of 13 smaller plastic bags. In support of the Tucker arrest warrant Jackson repeated these facts, but also

---

[19] Seizure Report, Ex. AA to Defs.' Mem. Supp., at 6; Evidence Record, Ex. CC to Defs.' Mem. Supp.; Lopes Supplementary Report, 7/18/2005 ("Lopes Report"), Ex. K to Pl.'s Mem. Supp., at 6; Lopes Dep. at 22:6–23:25 & 37:1–15.

included the fact that Connecticut Motor Vehicle records list Unit K-3 as Tucker's address as well as the location where the officers found the gun and drugs (inside a "black lamp . . . inside a small room in the basement") and the paperwork ("[i]n the kitchen").[20]

> D.    *October 6th Arrest of Tanisha Rogers*

According to a report by Stevenson, he and Deal served the arrest warrant on Plaintiff Tanisha Rogers on October 6th while she was at the WPD police station with her attorney.  Rogers testified that just before being arrested, the officers who arrested her "said that they had found cocaine and a gun in the home and that it's mine because Charles is not around to say that it's his, so I was going to be arrested for it because my name was on the lease."  After she denied that the drugs and gun belonged to her, the officers "said we know that it's not yours but you're going to take the fall for it," threatened her with consequences to her employment at DCF, and "threatened me saying that they were going to take me and my whole family down and they gave me a story about how there was a murder case that they had before where the girlfriend was hiding the boyfriend who had supposedly murdered someone and that they arrested 12 of the family members and a lot of people got in trouble because she wouldn't say anything."[21]  Stevenson and Deal arrested Tucker on November 17, 2004.[22]

---

[20] Warrant for Rogers's Arrest (issued October 6th), Ex. DD to Defs.' Mem. Supp.; Warrant for Tucker's Arrest for Drugs and Gun (issued October 7th), Ex. LL to Defs.' Mem. Supp. at ¶¶ 3–4.

[21] Fingerprint Card Upon Arrest, Ex. EE to Defs.' Mem. Supp.; Stevenson Supplementary Report, Ex. FF to Defs.' Mem. Supp.; Rogers Dep., Ex. 1 to Pl.'s Obj., at 157:15–159:21.

[22] Washington, D.C. police found a maroon Infiniti sedan on October 19, 2004, which was later determined to be "the vehicle Mr. Charles Tucker was last known to be

II.     **Motion for Leave to Amend Complaint or Preclude Angon Affidavit**

    A.     *Standards*

Plaintiff urges that she should be given leave to name Angon and Stevenson as defendants on her claims of warrantless entry and that the Court should toll the statute of limitations relating to them either on the basis of equitable tolling or fraudulent concealment.  The equitable tolling of a statute of limitations is an "extraordinary" remedy appropriately employed "'as a matter of fairness'" in circumstances "where a plaintiff has been 'prevented in some extraordinary way from exercising [her] rights,'" such that she "'could show that it would have been impossible for a reasonably prudent person to learn' about his or her cause of action." *Pearl v. City of Long Beach*, 296 F.3d 76, 85 (2d Cir. 2002) (citations omitted).  Although fraudulent concealment is often conflated with equitable tolling, it, unlike equitable tolling, is premised on a defendant's misconduct, and stands independent of the application of equitable tolling. *See Valdez ex rel. Donely v. United States*, 518 F.3d 173, 182–83 (2d Cir. 2008).

Alternatively, Plaintiff seeks exclusion of Angon's affidavit from the summary judgment record as sanction for Defendants' late disclosure of Angon's identity as a witness. Under Federal Rule of Civil Procedure 26(a)(1)(A)(i), a party is required, "without awaiting a discovery request," to "provide to" the opposing party "the name and, if known, the address and telephone number of each individual likely to have discoverable

––––––––––––––––––––

present in." On November 17, 2004, Stevenson and Deal traveled to Baltimore, Maryland after United States Marshals arrested Charles Tucker there.  In Baltimore, Tucker admitted to Stevenson and Deal that he had murdered Pagan, but he did not say anything regarding the gun or drugs found in Unit K-3.  (*See* Lopes Report at 6; Stevenson Supplementary Report, Ex. 14 to Pl.'s Obj.)

information—along with the subjects of that information—that the disclosing party may use

to support its claims or defenses, unless the use would be solely for impeachment." Rule

26(e) imposes on parties a continuing obligation to "supplement or correct [their]

disclosure" made under Rule 26(a).  Where a party fails its obligations under Rule 26(a) or

(e), the Court may preclude evidence supplied by the undisclosed witness or impose other

sanctions.  Rule 37(c)(1).  The Court has "wide discretion" to determine whether, how, and

how severely to sanction an offending party.  *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 294

(2d Cir. 2006); *see also Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (reviewing

imposition of sanctions under Federal Rule 37(c) "for abuse of discretion"); *Am. Stock Exch.,*

*LLC v. Mopex, Inc.*, 215 F.R.D. 87, 93 (S.D.N.Y. 2002) ("[d]espite the 'self-executing' nature

of Rule 37(c)(1), the imposition of sanctions under the rule is a matter within the trial court's

discretion"), *aff'd Mopex, Inc. v. Am. Stock Exch., Inc.*, No. 02-7477, 2003 U.S. App. LEXIS

1370, *2 (2d Cir. 2003).

      B.    *Discussion*

      Plaintiff moves to amend her complaint to add Angon and Stevenson as defendants

even though the three-year statute of limitations on her claims against them expired on

October 5, 2007—two months after she filed suit and two weeks after Defendants waived

service of summons.  Plaintiff focuses on Defendants' reliance on Angon's averment that

only Stevenson directed him to go to Unit K-3 on October 5th and that Angon, rather than

any named defendants, entered Unit K-3 without a warrant on that date.  It is undisputed

that neither party did, or pressed for, initial disclosures in this case, that Defendants never

disclosed Angon as a witness prior to filing for summary judgment, and that Defendants rely

very heavily on Angon's affidavit as support for their motion for summary judgment and to

15

oppose Plaintiff's motion for partial summary judgment. (*See* Defs.' Mem. Supp. at 19–28; Defs.' Revised Mem. Opp'n at 6.)

Defendants argue that Plaintiff has known since her criminal trial that both Angon and Stevenson were in some manner connected to the Pagan murder investigation which led, through a search of her home, to Plaintiff's arrest and prosecution. Apicella testified at that trial that he and Stevenson were both lead investigators into the Pagan murder, and that Angon came to Unit K-3 after Apicella had searched the apartment on October 6th. Plaintiff argues that while she knew of the involvement of Angon and Stevenson in the investigation, there was no reason for her to suspect their culpability in light of Apicella's testimony at the criminal trial that Angon was not involved in the October 5th search and that Apicella directly instructed Levesque to lead a detail of WPD officers to secure the premises at Unit K-3. Defendants argue that Plaintiff could have deposed Angon and Stevenson or sought from WPD a list of officers who entered Unit K-3 on October 5th, and that in any event discovery in this lawsuit took place after October 5, 2007, when the statute of limitations had already run on Angon and Stevenson for the warrantless search. At oral argument Defendants' counsel explained that she focused only on the alleged conduct of the named Defendants and had no knowledge of Angon's involvement in the October 5th search, or Stevenson's direction of Angon on that date, until preparing to oppose Plaintiff's motion for partial summary judgment, which Plaintiff's counsel first advised he intended to file at a status conference on July 10, 2008. She conceded that she was under a duty to supplement her discovery responses upon learning of Angon's and Stevenson's alleged roles in the warrantless entry, but she had learned of these roles only weeks before the motions for summary judgment were filed.

16

Given that there is no evidence that Defendants engaged in any misconduct or malfeasance, that Plaintiff filed this suit only two months before expiration of her statute of limitations on the warrantless search and seizure claims, that neither party provided or pressed for initial disclosures, and that no discovery was sought relating to other potentially liable officers, equitable tolling of the statute of limitations, tolling based on fraudulent concealment, and full preclusion of Angon's affidavit are unwarranted.  However, because Defendants rely almost exclusively on Angon's affidavit where Plaintiff has had no notice that he was a key witness in the October 5th search, the Court will exclude Angon's affidavit when considering Defendants' motion for summary judgment but will consider the affidavit used as opposition to Plaintiff's motion for partial summary judgment.  Notwithstanding this technical line-drawing, as the discussion below demonstrates, the affidavit creates a genuine issue of material fact only as to who entered the living quarters of Unit K-3 on October 5th and under whose direction they did so; in all other respects its content is immaterial to the Court's ruling.

Absent equitable tolling of the statute of limitations, Plaintiff's motion to amend her complaint to add Angon and Stevenson is futile and will be denied.

## III.    Cross-Motions for Summary Judgment

### A.    *Standards*

#### 1.    Summary Judgment

Summary judgment is appropriate where the record after discovery "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury

could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the burden of showing that he or she is entitled to summary judgment." *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson*, 477 U.S. at 249. In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant "need not prove a negative," but "need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The Court "construe[s] the evidence in the light most favorable to the non-moving party and . . . draw all reasonable inferences in its favor." *Id.* (quotation omitted, second alteration in original). If the record as a whole, viewed in the light most favorable to the non-moving party, "could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial," and summary judgment should follow. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quotation marks omitted).

2.    Qualified Immunity

"'Qualified immunity protects officials from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *In re County of Erie*, 546 F.3d 222, 229 (2d Cir. 2008) (quoting *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007)). As the Second Circuit has explained,

A police officer is entitled to qualified immunity if (1) his conduct does not violate a clearly established constitutional right, or (2) it was "objectively reasonable" for the officer to believe his conduct did not violate a clearly established constitutional right.  Thus, a defendant is entitled to summary judgment

> if [he] "adduce[s] sufficient facts [such] that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant[ ]" to believe that he was acting in a fashion that did not clearly violate an established federally protected right.

*Hartline v. Gallo*, 546 F.3d 95, 102 (2d Cir. 2008) (citations omitted).  "The question of whether a right is 'clearly established' is determined by reference to the case law extant at the time of the violation."  *In re County of Erie*, 546 F.3d at 229 (citing *Moore v. Andreno*, 505 F.3d 203, 215-16 (2d Cir. 2007)).  "This is an objective, not a subjective, test[.]"  *Id.*

      B.     *Warrantless Entries, Protective Sweeps, and Trespass*

          1.     Legal Principles

Plaintiff argues that Defendants' entry, or entries, into Unit K-3 without a warrant on October 5th violated her Fourth Amendment rights.  "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable."  *Payton v. New York*, 445 U.S. 573, 586 (1980).  A warrantless entry may be permissible under the Fourth Amendment, however, if justified by exigent circumstances or consent.  It is undisputed that WPD officers did not obtain Rogers's or Tucker's consent to enter Unit K-3 on October 5th.  "The essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an 'urgent need' to render aid or take action."  *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990) (*en banc*) (citations omitted).  Answering this

"essential question" requires examining the circumstances surrounding the entry in light of various "factors," an illustrative list of which includes:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect "is reasonably believed to be armed"; (3) "a clear showing of probable cause . . . to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) the peaceful circumstances of the entry.

*Id.* at 769–70 (citations omitted).

Plaintiff further argues that Defendants mis-characterize the entry into the living quarters as a "protective sweep" rather than a warrantless entry, and that in any event they violated Fourth Amendment law governing such sweeps. In the Second Circuit, "a law enforcement officer present in a home *under lawful process* . . . may conduct a protective sweep when the officer possesses 'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the . . . scene.'" *United States v. Miller*, 430 F.3d 93, 98 (2d Cir. 2005) (quoting *Maryland v. Buie*, 494 U.S. 325, 334 (1990)) (emphasis added, third alteration in *Miller*).

The Connecticut Constitution provides at least the same level of protection to individuals in their homes as does the Fourth Amendment. *See State v. Blades*, 225 Conn. 609, 618 (1993) (explaining that in emergency situations, police may engage in a "limited" and "prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises," which search "is strictly circumscribed by the emergency which serves to justify it . . . and cannot be used to support a general exploratory search") (citations omitted).

20

Finally, Plaintiff argues that Defendants' warrantless entry or entries into Unit K-3 on October 5th constituted a trespass.  In Connecticut, "[t]he essentials of an action for trespass are: (1) ownership or possessory interest in land by the plaintiff; (2) invasion, intrusion or entry by the defendant affecting the plaintiff's exclusive possessory interest; (3) done intentionally; and (4) causing direct injury." *City of Bristol v. Tilcon Minerals, Inc.*, 284 Conn. 55, 87 (2007).  Plaintiff argues, and Defendants do not contest, that the same injuries flowing from the alleged unlawful entries into Unit K-3 on October 5th constitute the injury for purposes of her trespass claim.

2.      Analysis

The parties cross-move for summary judgment as to Plaintiff's claims of warrantless entry and trespass.  Plaintiff claims that Defendant Levesque's warrantless entry into the garage area of Unit K-3 was impermissible under *MacDonald*, and that the entry, or entries, into the living quarters of Unit K-3 were impermissible under both *MacDonald* and *Miller*. She clarified at oral argument that she raises independent claims for each of these entries. Defendants, relying on Angon, argue that they had a "strong reason to believe that [Tucker] [wa]s in the premises being entered," that in any event none of the named Defendants engaged in the warrantless search on October 5th, and that they are entitled to qualified immunity.

Whether or not the Court considers Angon's conclusory averment on this point, the record is sparse on the bases for Levesque's claimed "urgent need" to enter the garage area on October 5th.  Whatever Apicella knew from his interview with Rogers was not imparted to Levesque.  Levesque drove his car into the garage area of Unit K-3 to prevent Rogers from

21

closing the garage door while he focused on whether Tucker might be in the living quarters, which is accessible through a door from the garage.

Unresolved factual issues preclude any legal conclusion that Levesque's entry into the garage was permissible or impermissible under *MacDonald*, or any determination that Levesque is entitled to qualified immunity. The record is silent as to the make, model and color of the car Rogers drove to Unit K-3 on October 5th, and whether Levesque knew what car the Pagan murder eyewitnesses had described Tucker as driving the previous night. It is also silent as to whether Angon knew any information about the car described by eyewitnesses, and whether he shared that information with Levesque. There is also no evidence in the record as to whether Levesque and other WPD officers, who according to Angon had been at Unit K-3 for fifteen minutes by the time Rogers arrived, took or could have taken steps to stop Rogers or visually inspect her car before she entered her garage, or whether when she got out of it, they searched the entire garage area or only spoke with Rogers. Without resolution of these issues of fact, it is not possible to determine whether Levesque acted reasonably in entering the garage area of Unit K-3. Therefore, summary judgment on this ground must be denied to both Plaintiff and Defendants.

As to the entry into the living quarters, Defendants argue that only WPD officers not named as defendants in this suit entered Unit K-3 after Rogers arrived home to search for Tucker. Whether regarded as a warrantless entry or a "protective sweep," this entry was unlawful absent exigent circumstances or consent. Defendants' factual basis on which they claim a "strong belief" that Tucker may have been inside is scanty and derived principally from the fact that Tucker, a resident of Unit K-3, was suspected of a murder less than 24 hours earlier, and his whereabouts were unknown. Rogers's arrival into the garage area itself

did not produce a new or greater "urgent need" for warrantless entry because officers prevented her from entering the living quarters, and thus her protection or complicity was not at issue. And nothing else had changed in the period between WPD officers' arrival at Unit K-3 and Rogers's arrival. Levesque testified that throughout the time he was posted at Unit K-3 he had observed no evidence of anyone inside the apartment. The officers knew that Tucker lived at Unit K-3 with Rogers and that Rogers appeared unhelpful to them. However, given the materiality of disputed facts as to who in the chain of command was giving orders relating to the premises and whether his or their knowledge of facts may be imputed to officers he or they were directing on the scene, these disputes must be unraveled by a jury.

The evidence suggesting that Tucker might be inside in the evening on October 5th from the anonymous caller's information that Rogers had instructed Tucker to remove a gun from the apartment is not shown to have been known only to Apicella. While there is no evidence that any WPD officer at Unit K-3 on October 5th knew about Apicella's conversation with the anonymous caller, this does not require the conclusion that no one else—for instance, Stevenson—was kept in the dark by Apicella such that any orders Stevenson may have given could not have been informed by this information. And even assuming that they were so informed, the record is too conflicted and sparse to determine whether the anonymous statement, in light of other circumstances or facts known to the WPD, would have provided support for an officer's "strong belief" in Tucker's presence at the apartment. *Cf. Florida v. J.L.*, 529 U.S. 266, 270–71 (2000) (holding that tip obtained through "a call made from an unknown location by an unknown caller" could not provide reasonable suspicion sufficient to justify *Terry* stop because it contained no indicia of

23

reliability, and explaining that "an anonymous tip, *suitably corroborated*," may support officer's reasonable suspicion) (emphasis added).  The same conclusion is required as to the officers' entry into Unit K-3's living quarters for a "protective sweep" and whether it was impermissible under *Miller*.

Thus, summary judgment for Plaintiff is inappropriate because there remain genuine issues of material facts regarding which officers entered the living quarters of Unit K-3, under whose direction they did so, and what information the commanding officers reasonably relied on in giving their orders.  Apicella testified that he put Levesque in charge of a detail of officers, but Angon, whose affidavit is considered in opposition to Plaintiff's motion for summary judgment, avers that he and unknown other officers entered the apartment under directions from Stevenson, not Levesque or Apicella.  Whether WPD officers on October 5th entered Plaintiff's living quarters pursuant to Levesque's direction, such that Levesque would be liable to Plaintiff for directing them to do so, or under other direction independent of Defendants Levesque, Apicella and Jackson, must be determined by a jury.  Moreover, there is a genuine issue of material fact as to the number of times WPD officers entered Unit K-3 without a warrant on October 5th.  Tia Rogers averred that she saw at least two entries that night after 8:30 p.m., which would be in addition to the entry occurring upon Plaintiff's arrival at 7:00 p.m.  The record contains no facts on which to conclude that any officer on the scene learned anything new after 8:30 p.m. that would provide articulable facts or create an "urgent need" justifying subsequent warrantless entries in violation of both *MacDonald* and *Miller*.

This disputed factual record also requires resolution before it can be determined if Levesque is entitled to qualified immunity.  There is no question that the law governing

warrantless entries under exigent circumstances was "clearly established" under *MacDonald* and *Buie* at the time of the warrantless entries at issue in this case. *MacDonald* and *Buie* were both decided in 1990, and even though *Miller* post-dates the events at issue here, *Miller* actually expanded the situations in which police officers may lawfully perform protective sweeps. *See Miller*, 430 F.3d at 98–99 (explaining that the Fourth Amendment permits protective sweeps once officers are lawfully inside a home under *any* lawful process, not, as *Buie* had held in 1990, only to execute an arrest warrant). However, the extent of Levesque's involvement in the WPD officers' warrantless entry into the apartment's living quarters is obscured by the conflicted factual record at hand.

      C.     *Warrantless Seizure*

Because the Fourth Amendment's "'central requirement' is one of reasonableness," *Illinois v. McArthur*, 531 U.S. 326, 330 (2001), not all warrantless seizures of a home are *per se* impermissible under the Fourth Amendment. Where a home is seized without a warrant, a court "balance[s] the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable." *Id.* at 331. In *McArthur*, where a woman told police that her husband kept drugs in their house, and police prohibited the husband from entering the house without an escort for two hours while a search warrant was obtained, the Supreme Court examined four factors in determining the reasonableness of the seizure: (1) probable cause to believe the home contained evidence of crime and contraband; (2) good reason to fear that evidence would be destroyed before they could return with a warrant; (3) reasonable efforts to reconcile law enforcement needs with right of personal privacy; and (4) restraint for limited period of time. *Id.* at 331–33. Plaintiff argues, and Defendants do not dispute, that the Connecticut Constitution, Article First, Sec. 7, provides at least the

25

same level of protection against unreasonable seizures of a home as does the Fourth Amendment.

Plaintiffs point out that WPD officers arrived at Unit K-3 by 7:00 p.m. on October 5th, but did not obtain and execute the search warrant until 10:45 a.m. the next day. Defendants argue that this 16-hour period is not *per se* unreasonably long in light of the 19-hour home seizure upheld in *Segura v. United States*, 468 U.S. 796, 801 (1984).  In *Segura*, New York Drug Enforcement Task Force agents, acting on information from individuals involved in a drug transaction and on the advice of an Assistant United States Attorney, arrested Segura and Colon and at 11:15 p.m. "secure[d] [Segura and Colon's] premises to prevent the destruction of evidence" until a search warrant could be obtained; due to an "'administrative delay'" the warrant was obtained after 5:00 p.m. the next day, and agents searched the apartment an hour later.  *Id.* at 800–01.  The Court upheld the search, explaining that because Segura and Colon were arrested, "[t]he actual interference with their possessory interests in the apartment and its contents was, thus, virtually nonexistent," *id.* at 813 and that much of the seizure occurred overnight, "when it is reasonable to assume that judicial officers are not as readily available for consideration of warrant requests," *id.* at 812–13.

It is undisputed that Levesque was the WPD officer who prevented Rogers from entering Unit K-3 in the evening of October 5th.  Plaintiff argues that there is no evidence in the record demonstrating that Levesque had good reason to fear that evidence would be destroyed, that either Levesque or other WPD officers engaged in reasonable efforts to reconcile their law enforcement needs with Plaintiff's rights of possession and personal privacy, or that Levesque's restraint was for a reasonably limited period of time.  While

*Segura* demonstrates that a 16-hour seizure is not, as a matter of law, *per se* unreasonable, neither is the duration of a seizure dispositive of its reasonableness. *Cf. Segura*, 468 U.S. at 812 ("Of course, a seizure reasonable at its inception because based upon probable cause may become unreasonable as a result of its duration or for other reasons."). Circumstances other than duration that made the officers' seizure in *Segura* reasonable—most notably, their arrest of the individuals who had the possessory interest in the home being seized—are not present here, where throughout the duration of the warrantless seizure it is undisputed that WPD officers did not arrest Plaintiff or have probable cause to suspect her of any crime. In addition, some of the factors on which the Supreme Court relied in *McArthur* are not present here, where Rogers was prevented from entering Unit K-3 for two hours until she left for her mother's house even though officers had searched the apartment to ensure Tucker was not there; she was not offered any "significantly less restrictive restraint," *McArthur*, 531 U.S. at 332, such as being escorted through Unit K-3 by WPD officers as she went to the bathroom and gathered clothing; the duration of the seizure was 16 hours; and the evidence thought to be in Unit K-3—clothes, weapons and ammunition, and proof of Tucker's occupancy—are, unlike the marijuana at issue in *McArthur*, not as easily destroyed, putting at issue whether Levesque reasonably could have feared evidence destruction if he had permitted Rogers to enter. However, Rogers only sought to enter from 7:00 p.m. to some point between 8:30 p.m. and 10:00 p.m., when due to the cold weather she went to her mother's home with her daughter, during which time officers told her a search warrant was being sought.

Nor can the Court conclude, as a matter of law, that the seizure was unreasonable, in light of the record's silence as to the activities of Jackson, any direction by Apicella, and

27

knowledge of all three named defendants, preceding and for the duration of the seizure. Instead, genuine issues of material fact preclude summary judgment either for Defendants or Plaintiff.  The record evidence is silent as to what efforts Jackson undertook to obtain the search warrant for the duration of the seizure of Unit K-3, what Levesque knew regarding those efforts, and how long WPD officers were at Unit K-3 after Plaintiff left the area between 9:00 p.m. and 10:00 p.m.   While Jackson obtained the search warrant at approximately 9:50 a.m. on October 6th, supporting an inference that he submitted a finalized warrant affidavit application to the court at the beginning of the next business day, WPD officers learned all of the information contained in the nine-paragraph affidavit by 5:45 p.m. on October 5th.  In addition, the record contains no evidence as to whether either Apicella or Jackson knew, in the evening on October 5th, that WPD officers, including Levesque, had prevented Plaintiff from entering her home. In considering Plaintiff's motion for summary judgment, and therefore considering Angon's affidavit, it is also unclear what Angon knew about Jackson's effort, from whom he received direction (if anyone) regarding Rogers's entry, and whether Angon shared any information with Levesque.

The factual issues left unresolved by the record bear directly on the question of whether Defendants' actions in preventing Rogers from entering her home on October 5th were reasonable, and thus preclude determinations of whether Defendants are entitled to qualified immunity and whether Plaintiff is entitled to judgment as a matter of law.  In sum, the parties' disputes as to what efforts Jackson made to obtain the warrant, what Levesque knew of these efforts, and how much of their activities Apicella controlled, are material to a determination of reasonableness, especially in light of the Supreme Court's particular emphasis on the efforts of officers to obtain warrants while preventing the entry of

28

individuals into their homes.  *See McArthur*, 531 U.S. at 332 (noting that the period during which police barred McArthur's entry "was no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant")*; Segura*, 468 U.S. at 810 ("securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence *while a search warrant is being sought* is not itself an unreasonable seizure of either the dwelling or its contents") (emphasis added).  Therefore, summary judgment is denied to both Plaintiff and Defendants as to Plaintiff's claim of unreasonable seizure of Unit K-3.

     D.     *False Arrest and Malicious Prosecution*

     1.     Legal Principles

Under § 1983 a plaintiff claiming false arrest must demonstrate that he was subjected to the "deprivation of a[] right[], privilege[], or immunit[y] secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983.  "The common law tort of false arrest is cognizable under § 1983 only if it also encompasses a violation of federal statutory or constitutional law." *Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir. 1995).  If Plaintiff's arrest was supported by probable cause, her false arrest claim fails.  *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) ("The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest,' whether that action is brought under state law or under § 1983.") (citations omitted); *Beinhorn v. Saraceno*, 23 Conn. App. 487, 491 (1990) (absence of probable cause is an element of a false arrest claim).

To prove a claim of malicious prosecution by Connecticut state officials under § 1983 a plaintiff must establish both the elements of malicious prosecution under Connecticut law, and his deprivation of a Fourth Amendment right. *Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002).  In Connecticut,

> [a]n action for malicious prosecution against a private person requires a
> plaintiff to prove that: (1) the defendant initiated or procured the institution
> of criminal proceedings against the plaintiff; (2) the criminal proceedings
> have terminated in favor of the plaintiff; (3) the defendant acted without
> probable cause; and (4) the defendant acted with malice, primarily for a
> purpose other than that of bringing an offender to justice.

*Bhatia v. Debek*, 287 Conn. 397, 404 (2008) (quoting *McHale v. W.B.S. Corp.*, 187 Conn. 444,

447 (1982)).

Underpinning all of Plaintiff's claims for false arrest and malicious prosecution is her

claim that Defendants purposefully omitted from the arrest warrant affidavit material facts

that, had they been included, would have vitiated or negated probable cause. "A section

1983 plaintiff challenging a warrant on this basis must make the same showing that is

required at a suppression hearing under *Franks v. Delaware* . . .: the plaintiff must show that

the affiant knowingly and deliberately, or with a reckless disregard of the truth, made false

statements or material omissions in his application for a warrant, and that such statements

or omissions were necessary to the finding of probable cause." *Velardi v. Walsh*, 40 F.3d 569,

573 (2d Cir. 1994). "Disputed issues are not material if, after . . . supplying any omitted facts,

the 'corrected affidavit' would have supported a finding of probable cause." *Id.* at 573–74.

2.    False Arrest

Plaintiff argues that Apicella and Jackson (1) omitted from Rogers's arrest warrant

affidavit the fact that the gun and drugs found in the laundry room were near a bag with

Charles Tucker's name on it, in which the officers found drug-selling paraphernalia (plastic

bags); (2) omitted from the warrant affidavit the fact that Apicella found the paperwork

linking her to Unit K-3 in the kitchen, thus distant from the drugs and gun in the laundry

room; and (3) included the paperwork's location in Tucker's arrest warrant affidavit but not

30

in Rogers's, demonstrating Apicella's and Jackson's deliberate disregard for the truth.  The parties do not dispute that possession is an element of both the narcotics and gun crimes for which Plaintiff's arrest warrant issued.  Plaintiff relies on the Connecticut Supreme Court's decision in *State v. Alfonso*, 195 Conn. 624, 633 (1985), which precludes any conclusion that a defendant possesses contraband premised solely on her non-exclusive possession of the premises in which it was found, and which was the basis for Rogers's judgment of acquittal in her criminal trial.[23]

Plaintiff's argument that this evidentiary insufficiency on which her acquittal was based also demonstrates a lack of probable cause to arrest her, however, is unavailing.  None of the information contained only in Tucker's arrest warrant affidavit ties the contraband to Tucker any more than it ties the contraband to Rogers.  Inserting both this omitted material, and the existence of the paper bag bearing Tucker's name and drug-selling paraphernalia near the drugs, into Plaintiff's arrest warrant, probable cause would continue to exist to arrest and prosecute Rogers, who undisputedly lived there with only Tucker, her boyfriend.  While there was deemed to be insufficient evidence to establish beyond a reasonable doubt that Rogers possessed the drugs, there is a wide gulf between the facts necessary to establish probable cause and those necessary to establish guilt beyond a reasonable doubt.

Probable cause requires only that "the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person

---

[23] Plaintiff was prosecuted only for possession with intent to sell a half-gram or more of crack cocaine.  At oral argument Plaintiff's counsel explained that because the firearm that Apicella found in Unit K-3 on October 6th was inoperable, it could not form the basis of a criminal conviction, and thus that that charge was dropped.  (Oral Arg. Tr. at 67.)

of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant*, 101 F.3d at 852.  In Connecticut, "[p]robable cause, broadly defined, [is established by] such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred." *State v. Grant*, 286 Conn. 499, 511 (2008).  Regardless of the location of the gun, drugs, and drug-selling paraphernalia in the apartment, a reasonable person could believe that either of the members of the resident couple living in the apartment possessed this contraband, even though additional facts of specific possession would be required to convict the suspect. *Cf. State v. Johnson*, 286 Conn. 427, 435 (2008) ("We consistently have held that [t]he quantum of evidence necessary to establish probable cause exceeds mere suspicion, but is substantially less than that required for conviction. . . . The existence of probable cause does not turn on whether the defendant could have been convicted on the same available evidence. . . . [P]roof of probable cause requires less than proof by a preponderance of the evidence. . . . Probable cause, broadly defined, comprises such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred. . . . The probable cause determination is, simply, an analysis of probabilities") (quoting *State v. Clark*, 255 Conn. 268, 292–93 (2001)) (alterations in *Clark*).

Including the evidence omitted from Rogers's arrest warrant affidavit, probable cause existed to arrest her for possession of a half-gram or more of narcotics with the intent to sell, and for unlawful alteration of a firearm.  Therefore, summary judgment must be granted to Defendants on Plaintiff's false arrest claims under the Fourth Amendment, Connecticut Constitution, and state common law.

3.      Malicious Prosecution

When Stevenson and Deal arrested Tucker on November 17, 2004, Tucker confessed only to shooting Pagan, but not to possessing the gun or drugs with which Rogers was charged.  Tucker's confession thus has no bearing on whether Defendants had probable cause to prosecute her.  Plaintiff points to no evidence in the record of anything that WPD officers learned after Rogers's arrest but during her prosecution that altered the probable cause analysis above.  Therefore, probable cause existed to prosecute Rogers and summary judgment must be granted to Defendants on Plaintiffs' malicious-prosecution claims under the Fourth Amendment, Connecticut Constitution, and state common law.

E.      *Conspiracy to Violate Plaintiff's Constitutional Rights*

At oral argument Plaintiff conceded that if there was probable cause to arrest and prosecute her, then her § 1983 conspiracy claim must fail.  Having concluded that probable cause existed to arrest and prosecute Plaintiff, the Court grants summary judgment to Defendants on Plaintiff's conspiracy claim.

F.      *Intentional Infliction of Emotional Distress ("IIED")*

In Connecticut the tort of intentional infliction of emotional distress ("IIED") is comprised of four elements:

> "It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe."

*Appleton v. Board of Educ. of Town of Stonington*, 254 Conn. 205, 210 (2000) (quoting *Petyan v. Ellis*, 200 Conn. 243, 253 (1986)).   Whether an actor's conduct is "extreme and outrageous" is an issue for the Court in the first instance and a factual question for the jury

33

"[o]nly where reasonable minds disagree" as to whether "the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 210–11.

Plaintiff testified that WPD officers told her that they knew she did not commit the crimes for which she was arrested, but that they would arrest and charge her anyway.  They "sa[id] that they were going to take me and my whole family down," and stated that "they arrested 12 of the family members [of another girlfriend of a murder suspect] and a lot of people got in trouble because [the girlfriend] wouldn't say anything." (Rogers Dep., Pl.'s Ex. 1, at 66.)  Plaintiff also testified that WPD officers twice threatened her employment and her custody of her children.

Although there was probable cause to arrest and prosecute Rogers, the Court cannot conclude that no reasonable jury could conclude that threatening to have Plaintiff fired from her job and stripped of custody of her children, threatening to prosecute Plaintiff for crimes they said they knew she did not commit, threatening Plaintiff's "whole family," and preventing Plaintiff from even briefly entering her own home to collect clothing, is not collectively extreme and outrageous conduct, or that the officers who did so intended to cause and did cause Rogers emotional distress.  In fact, Defendants claim the existence of genuine issues of material fact on causation—whether it was Defendants' conduct, as opposed to other circumstances, that caused Plaintiff's emotional distress.  Defendants' claim that the symptoms Rogers alleges to have suffered—*inter alia*, trouble sleeping, anxiety, headaches, nausea, bowel problems, and depression (Pl.'s Response to Interrogatory, Ex. KK to Defs.' Mem. Supp.)—are insufficient as a matter of law to support an IIED claim because she did not seek treatment, is unaccompanied by citation to authority, and the Court finds

no basis for concluding that a plaintiff who fails to seek medical treatment is barred from recovery on that basis. Finally, Defendants conceded at oral argument that the supplemented record, reflecting WPD calls to DCF about Plaintiff, presented genuine issues of material fact precluding summary judgment. (Oral Arg. Tr. at 75.)

As elsewhere in the record, there are genuine issues of material fact regarding whether Defendants were the WPD officers who engaged in the activities on which Plaintiff bases her IIED claim. While it is undisputed that Levesque prevented Rogers from entering Unit K-3 on October 5th, that Apicella spoke with Rogers at DCF, and that Apicella shared leadership responsibilities over the Pagan murder investigation, which the record evidence suggests extended through Plaintiff's arrest, it remains disputed and unclear who was at Unit K-3 on October 5th, under whose direction they were operating, and what they told Plaintiff. There is no clarity in the record regarding who spoke with Plaintiff at the WPD station on October 6th and threatened her family if she did not cooperate with them to find Tucker. Resolution of these factual issues is essential to a determination of whether any named Defendants can be liable on the IIED claim. Hence, summary judgment must be denied to Defendants as to this claim.

G.   *Municipal Liability*

At oral argument Plaintiff clarified that the issue of municipal liability is asserted only for indemnification purposes if she prevails against individually named defendants—and not as an independent cause of action against the City, contrary to Defendants' construction of this claim in Plaintiff's complaint. Defendants do not dispute that if Apicella, Levesque and/or Jackson is found liable of violating Plaintiff's civil rights, the City would be liable to indemnify them under Conn. Gen. Stat. § 7-465. With the basis

for Plaintiff's claim of municipal liability thus clarified, summary judgment is denied to Defendants.

**IV.     Conclusion**

For the reasons stated above, Plaintiff's Motion for Leave to Amend Complaint [Doc. # 46] is DENIED; Plaintiff's Motion for Partial Summary Judgment [Doc. # 31] is DENIED; and Defendants' Motion for Summary Judgment [Doc. # 33] is GRANTED as to the claims of false arrest and malicious prosecution and conspiracy and is otherwise DENIED.  Plaintiff's claims of the impermissibility of the warrantless entry or entries and the warrantless seizure of Unit K-3, and her IIED claim, remain for trial.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 26th day of March, 2009.